## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TRAVE WILSON** | **CIVIL ACTION** |
| **versus** | **NO. 12-2239** |
| **N. BURL CAIN** | **SECTION: "R" (1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Trave Wilson, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On September 30, 2009, he was convicted in a bench trial of

second degree murder under Louisiana law.[1]  On December 17, 2009, he was sentenced to a term

of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On January

26, 2011, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[3]  The

Louisiana Supreme Court then denied his related writ application on September 2, 2011.[4]

On September 5, 2012, petitioner filed the instant application seeking federal *habeas*

*corpus* relief.[5]  The state concedes that petitioner's application is timely filed but argues that his

claims have no merit.[6]

### I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.

Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of

fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal

habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

---

[1]  State Rec., Vol. IV of V, transcript of September 30, 2009, p. 57; State Rec., Vol. I of V, minute entry dated September 30, 2009.

[2]  State Rec., Vol. IV of V, transcript of December 17, 2009, p. 11; State Rec., Vol. I of V, minute entry dated December 17, 2009.

[3]  State v. Wilson, No. 2010-KA-0770, 2011 WL 9159662 (La. App. 4th Cir. Jan. 26, 2011); State Rec., Vol. II of V.

[4]  State v. Wilson, 68 So.3d 525 (La. 2011) (No. 2011-KO-0382); State Rec., Vol. IV of V.

[5]  Rec. Doc. 1.

[6]  Rec. Doc. 18.

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme

> Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), cert. denied, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## II.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Defendant Trave Wilson was indicted, tried, and convicted of the October 14, 2007 second degree murder of Carmen Reese.
>
> New Orleans Police Department communications supervisor Gisele Roussel identified an audiotape of a 911 call under incident number J17476-07, placed on October 14, 2007, at 18:24 hours.  The original location associated with the call was 1488 Mandolin Street, which was later changed to 1500 Mandolin Street.  The call came out as a general complaint, but it was later changed to a homicide.
>
> On October 14, 2007, at approximately 6:35 p.m., New Orleans Police Department Detective John Helou, then a patrol

officer, responded to a call of a female down in the 1500 block of Mandolin Street. He found a female lying faceup and unresponsive in a service alley at that location.

New Orleans Police Department Homicide Detective Anthony Pardo responded to the scene. He said the nude victim was on her back in an overgrowth of brush in the service alley between 1500 and 1502 Mandolin Street. She exhibited several gunshot wounds and had abrasions on her body. Rape kit evidence was collected from the victim's body prior to her autopsy. No evidence was found at the scene that indicated the victim was killed at that location. It was determined that the victim was killed in a FEMA trailer at 1512 Mandolin Street. Upon arrival at the trailer he observed a bullet exit mark on the front door. A search warrant was obtained for the FEMA trailer and a residence at the same address. Det. Pardo determined during the investigation that defendant resided in the trailer and his nephew, Manuel Wilson, lived in the residence. Det. Pardo identified numerous photos of the crime scene, including fabric inside of a trash/garbage can next to the FEMA trailer at 1512 Mandolin Street that was matched to a mattress cover on a mattress inside of the trailer, as well as a photo of the mattress and cover. One photo was of a "3-XL" black T-shirt that was found in the aforementioned garbage can.

Det. Pardo testified that twelve hours after the discovery of the victim Det. Pardo interviewed defendant at the Third District Baton Rouge Police Department station. Prior to interviewing defendant Det. Pardo advised defendant of his Miranda rights. He identified a rights-of-arrestee form reflecting that defendant waived his Miranda rights and gave a statement, an audio tape of which was played for the jury [sic]. Det. Pardo testified that an arrest warrant was obtained for defendant after his statement was given, and he was arrested by Baton Rouge police and transported to New Orleans. Upon his arrival defendant wanted to give a second statement. He was again advised of his Miranda rights, whereupon he waived them via a rights-of-arrestee form and gave a second statement, an audiotape of which was played for the jury [sic].

Det. Pardo confirmed on cross examination that no gun was ever found. The garbage can outside the trailer contained a swatch of material containing what was later determined to be blood. Defendant was advised of his Miranda rights at 4:15 a.m., on October 15, 2007, and began giving his first statement, which ran twenty-six minutes, at 6:03 a.m. The second statement was taken later that afternoon, beginning at 4:10 pm. and ending at 4:25 p.m. Defendant

told the detective he wished to make another statement, that the first one was not entirely true and correct.   Det. Pardo stated that defendant did not appear intoxicated at the time of the second statement.  When asked whether defendant appeared tired, Det. Pardo replied in the negative, stating that defendant appeared to be in good shape.  Det. Pardo said no identifiable fingerprints were lifted from the trailer or the trash/garbage can.  Det. Pardo confirmed that no female clothing was ever recovered in connection with the case, nor any purse connected to the victim.

In defendant's first statement, given at 6:03 a.m. on October 15, 2007, the first he said about what had occurred on October 14, 2007, was that he left his trailer, "came back and um, seen the guy uh, exiting the trailer with the uh, with the female that I had uh, sex with."  He said he met the victim in the 500 block of Bourbon Street, but replied "not really" when asked if he knew her from the area.  He had seen her around a couple of times on the street.  She had introduced him to someone who was her Sugar Daddy "or somethin'."  Defendant said that person was going to follow them, and that "um, he stayed outside that ... that uh, premises where me and her was."  They took the bus to his trailer.  The other male stayed close behind them.  Defendant said he and the victim went to his trailer and had sex.  He then left.  Defendant said he used a condom, but also replied in the affirmative when asked whether he had unprotected sex with the victim.  Defendant left the trailer, returned, and he saw the victim and the "Sugar Daddy" in the trailer together. They were arguing.  At one point defendant said that the next thing he knew, the man was carrying the victim out, but defendant later stated that the man did not leave the trailer carrying the victim until approximately twenty minutes after he heard them arguing.  He said blood from the victim was located on the floor.  He wiped it with a rag.  Blood got on his dark T-shirt.

Defendant stated that the man went to the back of the garage and, defendant "guessed," laid her down.  At one point in his statement defendant confirmed that he touched the victim's body while the man was carrying it.  Defendant described the man as dark-skinned, tall and slim, with his hair in twists.  Defendant confirmed that he saw the victim's body in the alleyway.  He denied killing the victim.  After the man came back defendant did not pay any more attention to him.  Afterward, defendant walked from corner to corner and sat down in the trailer for a while.  He left New Orleans early in the morning with his nephew for Baton Rouge.  He said he went to Baton Rouge to spend time with his sister.  He denied that he

was scared. When asked why he did not call police, defendant replied, "I was uh ... I was ... I was under the ... the ... the discretion ... depression whether, whether or not I should call 'em or not." Defendant admitted removing a swatch of cloth from the mattress. He said he did it because it had sperm on it; he put the piece of fabric in the trash can by the front door. He also put his T-shirt in there because he had wiped up blood with it and did not need it anymore.

In defendant's second statement, given at 4:10 p.m. on October 15, 2007, defendant confirmed that he and the victim went to his trailer to have sexual relations, and that she intended to charge him money for the sexual relations. He said that when he did not pay her, "she turned around and discovered her gun ... and uh ... made a few threats...." He said he did not have the money. She demanded the money and yelled some words at him. She pointed the handgun at him. She turned away and then the gun went off, two times he thought, and she was struck. He replied in the negative when asked whether he ever struggled with her over the gun. However, he also indicated that there was a struggle between the two of them at some point. After the gun went off, the male with the twist hairstyle that defendant described in his first statement came inside. Defendant left and went to a friend's home five blocks away. He indicated that the male with the twist hairstyle carried the victim's body out to the back, as he had said in his first statement.

Much of defendant's two statements was listed as "inaudible." Much of each statement was also unintelligible.

New Orleans Police Officer Kenneth Leary, a firearms examiner with the police department's crime laboratory, testified that two nine millimeter bullets recovered from the victim had been fired by the same firearm.

New Orleans Police Department Crime Laboratory criminalist Jodie Clements was qualified by joint stipulation as an expert in testing for the presence of human bodily fluids and serology. Clements testified that she tested a piece of maroon and cream material with stripes and that the test indicated the presence of human blood.

Dr. Samatha Huber, a forensic pathologist with the Orleans Parish Coroner's Office, was qualified by joint stipulation as an expert in forensic pathology, anatomic pathology, and clinical pathology. Dr. Huber participated in the autopsy of the victim, Carmen Reese. She stated that abrasions on the victim's face, including beneath her chin, were from a struggle, giving an example of friction against the force of an arm or a hand. Dr. Huber testified

that one of four gunshot wounds was from a bullet fired at near contact range; one was from a bullet fired under six inches away; one from a bullet fired from approximately six to eighteen inches away; and one from a bullet fired from an indeterminate range. Abrasions on the victim's back were probably caused by her being dragged or moved while on the ground, as were abrasions on her hip/groin area. All abrasions except the one on her back were caused before the victim's death. Dr. Huber suggested that the victim would have lost consciousness in ten to fifteen seconds from a perforated inferior vena cava, with death following very closely. Dr. Huber took swabs of the victim's oral, vaginal, and rectal cavities. The toxicology report reflected the presence of ethyl alcohol, but Dr. Huber stated that because the victim's body was in a state of early decomposition, in which the body produces ethyl alcohol, the finding might not indicate any alcohol consumption at all by the victim.

Jacklyn Smith Bell testified that the victim was her best friend, and that at the time of the victim's death she was in contact with her by email or telephone anywhere from daily to weekly, depending on Bell's schedule. However, Bell said she had not spoken to the victim for at least a week or two before her death. Bell testified that the victim had talked about defendant several times before, including the last day Bell had any contact with the victim, during a phone call. The victim told Bell about an older black male named "Trav or something, Trevon or something like that, and Williams or Wilson," had been bothering her about wanting to prostitute her out for drugs or money. Bell had asked the victim if the individual was "boneable," and the victim said, "No, he's ugly as f——. You don't even know." The victim told Bell she met the man at "Bewitched Gentlemen's Club," where she worked as dancer. When Bell learned from someone on October 17, 2007, that the victim had been murdered, she contacted Det. Pardo and told him what she knew.

Jacklyn Bell conceded on cross examination that the victim had never, at any time, said that she was physically afraid of defendant, only that she was very annoyed with him.

Jerome Dubois, a DNA analyst with the Louisiana State Police Crime Lab, was qualified by joint stipulation as an expert in the field of DNA analysis. His testing of the vaginal swab taken from the victim revealed a clear mixture of DNA between defendant and the victim. As to the rectal swab, testing revealed that the victim and defendant could not be excluded as contributors to the sample – whereas approximately 94.6 percent of the population could be. It

was Dubois' expert opinion that, based on the test results, defendant could not be excluded as a contributor to the rectal and vaginal samples. As for the oral swab evidence, Dubois testified that, although the results indicated that spermatozoa and seminal fluid were present, he was unable to obtain a male DNA profile for comparison to defendant.

On cross examination, defense counsel stated that whether or not defendant had sex with the victim was not in contention. Dubois replied in the affirmative when asked whether, if defendant had consensual sex with her the same DNA profile would be present.

Defendant testified in his own defense. He replied in the affirmative when asked by his counsel on direct examination whether his first statement, given in Baton Rouge, was a true and accurate account of what transpired at his trailer. As to the second statement, defendant said he did not request to speak with Det. Pardo and give a second statement. He testified that he believed he was in his cell when Det. Pardo asked if he wanted to make another statement. Det. Pardo told him that he had to make another statement because the first statement did not sound right. Det. Pardo told defendant that it sounded like he was telling them a bunch of lies in the first statement, and that they would give him another chance to help himself out. He said Det. Pardo told him that no one would believe his first story and that he had to make up something. Defendant said "everybody was like, 'Well, just let him make anything up,' you know." He said police told him they had his family in custody, specifically mentioning his nephew, who was living in the residence at 1512 Mandolin Street, while defendant was residing in the trailer on the property. Defendant mentioned in his testimony that he had known the victim for a day or two. Defendant replied in the negative when asked whether he had forced the victim to go to his trailer, force her to have sex with him, or killed her.

Defendant admitted on cross examination that at the time of the crime he resided in the trailer at 1512 Mandolin Street and was working at a French Quarter restaurant. On the night of the killing he left work and went to Bourbon Street where he met the victim. He said they started talking about sex for money, but he told her he did not have any. He said her "pimp" was there, and that she ran back and talked to him twice before they left. Defendant asked her to come to his residence, and she did. They caught the bus, with the pimp sitting in the back of the bus behind them. When defendant and the victim exited the bus the pimp exited through the rear doors; he followed defendant and the victim to the trailer. The pimp stayed

outside. Defendant said he looked out a window of the trailer a couple of times, and the pimp was there. Defendant said that day, October 14, 2007, was the first time he had ever met or even seen the victim. Defendant said he had seen the pimp before, perhaps a couple of times.

Defendant testified that he and the victim had sex on a pulled out sofa-bed when they returned to the trailer and then went into the bedroom. They went to sleep afterward. Defendant got up and told the victim he was leaving, but that she could stay. He said she indicated "all right" and was fooling with her personal items when he left. Several questions later defendant replied in the affirmative when asked whether the last time he saw the victim alive was when she was sleeping in his bed. Defendant left, and the pimp went inside the trailer. Defendant walked about a half block, then returned and stood by the trailer for a minute or so. He heard arguing inside the trailer. Defendant walked off. Defendant was asked when he had peeked into the trailer and seen the victim's body; he said that happened minutes after he had left, although it was unclear whether he meant the first time he left or the second time. Then the pimp carried the victim's body out of the trailer on his shoulders to the alley. Defendant said the pimp saw him during this time, but did not pay attention to him. The pimp simply went about what he was doing.

Defendant testified that he went back into the trailer about 6:00 a.m. and cleaned up. He said he threw out a pair of Converse Allstars tennis shoes that he was working in and got so messed up he could no longer wear them. He saw a T-shirt thrown on the sofa. The piece of cotton he had torn out of the mattress looked like it had sperm on it. So he threw it, the tennis shoes, and a cloth into the trash can outside, along with other items. Defendant said he also wiped a spot of blood up off the floor. Defendant said there was no truth to his second statement, except for the part about going back and touching the victim's body. Defendant touched the bottom of her feet. He later confirmed that there was a struggle involving the victim, given the injuries to her body. However, defendant expressly stated that he did not put his hands on her or try to hurt her, bruise her, or anything like that, before they had sex or before he left. Defendant was shown a photo of the victim's body, and he replied in the negative when asked whether she had the abrasions when he met her on the night of her death. Defendant denied penetrating the victim orally or in her rectum, but said the victim took his penis into

her mouth for a few seconds.  He had no explanation for why his DNA was in the victim's rectum.[7]

### III.  Petitioner's Claims

### A.  Waiver of Jury Trial

Petitioner's first claim is that "[t]he trial judge erred in proceeding with a judge trial when the record does not reflect that Mr. Wilson was advised of his right to a jury trial and personally and affirmatively waived the right."[8]  As the Louisiana Fourth Circuit Court of Appeal noted in denying relief, that claim is patently false:

> [D]efendant argues that the trial court erred in proceeding with a judge trial when the record does not reflect that defendant was personally advised of his right to a jury trial and personally waived that right.
>
> However, at the time defendant's appellate counsel filed the appellant brief on behalf of defendant, the record had not yet been supplemented with a copy of a transcript of some preliminary matters on the morning of defendant's trial, including when the trial court ensured that defendant knowingly and intelligently waived his right to a trial by jury.  Defendant made the decision against the advice of his trial counsel.
>
> A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive his right to trial by jury and elect to be tried by the judge.  La.C.Cr.P. art. 780(A); State v. Lee, 2001-2082, p. 4 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 622.  The waiver must be express and is never presumed.  State v. Duplessis, 2007-1005, p. 5 (La.App. 4 Cir. 12/19/07), 974 So.2d 65, 68.  A waiver of the right to trial by jury is valid only if the defendant acted knowingly and voluntarily.  State v. Kahey, 436 So.2d 475, 486 (La. 1983); State v. Santee, 2002-0693, p. 3 (La.App. 4 Cir. 12/4/02), 834 So.2d 533, 534.  However, while the trial judge

---

[7] State v. Wilson, No. 2010-KA-0770, 2011 WL 9159662, at *1-5 (La. App. 4th Cir. Jan. 26, 2011); State Rec., Vol. II of V.

[8] Rec. Doc. 1, p. 8.

must ensure that a defendant knowingly and intelligently waives his right to a jury trial, that determination does not require a <u>Boykin</u>-like colloquy.[FN2]  <u>State v. Williams</u>, 2007-0700, p. 14 (La.App. 4 Cir. 2/13/08), 977 So.2d 1101, 1113.

> [FN2]  <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

In <u>Duplessis</u>, *supra*, as in the instant case, the trial court advised the defendant of his right to a jury trial as well as his right to waive that right and be tried by the court.  The trial court then asked the defendant if he understood those rights and had discussed them with his counsel.  The defendant responded affirmatively to both questions.  Under those facts, this court found that the trial court had adequately advised the defendant of his right to a jury trial and that he had knowingly waived that right.

In <u>Williams</u>, *supra*, the trial court informed the defendant that he was entitled to a trial by a six-person jury, all of whom had to agree to reach a verdict.  The court also informed the defendant that he had a right to waive his right to trial by jury and elect a trial by judge, and that his counsel had informed the court that the defendant wished to elect a trial by judge.  The trial court asked the defendant if that was correct, and he replied in the affirmative. The trial court asked the defendant's counsel if he agreed with that decision, and counsel replied in the affirmative.  This court held that the defendant thus had made a knowing and voluntary waiver of his right to trial by jury.

In reaching its decision in <u>Williams</u>, *supra*, this court compared the facts in that case to those in this court's prior decision in <u>Lee</u>, *supra*, where the trial court asked the defendant in the presence of his attorney whether he understood that he had a right to trial by judge or jury.  The defendant responded affirmatively.  The trial court then asked the defendant what type of trial he elected to proceed by, and the defendant replied that he would like to go with a judge trial.  This Court held that this colloquy clearly established that the defendant had articulated his desire to waive his right to a jury trial, and it thus rejected his argument on appeal that the record failed to show that he made a knowing and intelligent waiver of his right to a jury trial.

In the instant case, the trial court personally addressed defendant, ensuring that he knowingly and intelligently waived his right to trial by jury.  The trial court first advised defendant on the

morning of trial that he had the right to be tried by a twelve-person jury or by the court.  Defense counsel advised the court that defendant had informed him that he would like to be tried by the judge, and that he, defense counsel, had counseled defendant against that, telling him that he should elect to be tried by a jury.  The trial court again advised defendant of his right to be tried by a jury or the judge, and that it was completely up to him.  However, the trial court stated, "I would strongly suggest that you listen to Mr. Rantz, your lawyer."  Defendant stated that he had not had an opportunity to explain himself to an attorney since he had been locked up, and that he had been given about ten attorneys.  The trial court directed defendant back to the issue of whether he wanted a trial by judge or jury.  The trial court then permitted defendant to converse with his trial counsel for about ten minutes.  Thereafter, when the trial court asked defendant whether he wanted to be tried by a jury or the court, he replied, "By the Court.  By the Court, your Honor."  The trial court cautioned defendant that, while it liked to think of itself as fair and objective, sometimes it was easier for a lawyer to work with a jury in terms of expressing a defense or explaining some evidence that the State had against him.  The court informed defendant that if he went with a jury trial his attorney could argue that he was innocent or that the State did not have enough proof to show that he was guilty.  The trial court informed defendant of the mandatory life sentence for a verdict of guilty as charged.  Defendant said he'd rather go with a judge trial so that the trial judge could understand what he was saying on the witness stand.  He concluded by stating, "I'd rather go with a Judge trial."

The record establishes that defendant made a knowing and intelligent waiver of his right to trial by jury.

There is no merit to this assignment of error.[9]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[10]

---

[9] Wilson, 2011 WL 9159662, at *8-10; State Rec., Vol. II of V.

[10] State v. Wilson, 68 So.3d 525 (La. 2011) (No. 2011-KO-0382); State Rec., Vol. IV of V.

For the following reasons, it is abundantly clear that the state court's decision was not contrary to, or did not involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court of the United States.

The United States Fifth Circuit Court of Appeals has explained:

> The Constitution guarantees criminal defendants the right to a trial by jury for serious offenses. U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury"); id. at amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.");[FN6] Duncan v. Louisiana, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that a jury trial is not constitutionally required for petty offenses). The Supreme Court has long recognized, however, that defendants have the right to waive a trial by jury. Patton v. United States, 281 U.S. 276, 297-99, 50 S.Ct. 253, 74 L.Ed. 854 (1930), abrogated on other grounds by Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).
>
> > [FN6]  The Sixth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  See Gideon v. Wainwright, 372 U.S. 335, 342-45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).
>
> More generally, the Court has held that the waiver of a constitutional right is not presumed, that the waiver must be knowing and intelligent, and that "courts [must] indulge every reasonable presumption against waiver of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (quotation omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 241-42, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  In Brady v. United States, the Court held that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).  The question whether waiver is proper "depend[s] on the unique circumstances of each case." Adams v. United States ex rel. McCann, 317 U.S. 269, 278, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Additionally, the waiver of a constitutional right cannot be presumed

– 15 –

> from a silent record. <u>Boykin v. Alabama</u>, 395 U.S. 238, 242, 89 S.Ct.
> 1709, 23 L.Ed.2d 274 (1969).

<u>Scott v. Cain</u>, 364 Fed. App'x 850, 853 (5th Cir. 2010).

As accurately noted by the state court, the record in this case is far from silent concerning petitioner's waiver of a jury trial. The judge expressly informed petitioner of his right to a jury trial; defense counsel stated on the record that he had he advised his client "against a Judge trial" and that "he should go with a jury trial under the circumstances of the case"; the judge stated on the record that she "strongly suggest[s] you listen to Mr. Rantz, your lawyer"; petitioner was then given additional time to consult with his lawyer; and the judge thereafter again advised petitioner of the benefits of having his case tried by a jury. Despite all of that, petitioner then again stated on the record: "I'd rather go with a Judge trial."[11]

Although petitioner now clearly regrets his decision to waive his right to trial by jury, there is no question whatsoever that his waiver was express, knowing, intelligent, and voluntary. Accordingly, under the facts of this case and the deferential standards mandated by the AEDPA, this claim should be denied. <u>See, e.g.</u>, <u>Pierre v. Leger</u>, 495 Fed. App'x 403 (5th Cir. 2012), <u>cert. denied</u>, 2013 WL 171851 (U.S. Mar. 18, 2013).

<u>B. Hearsay/Confrontation Clause</u>

Petitioner states his second claim as follows:

> The trial judge erred in allowing the hearsay testimony of Ms. Bell
> to be introduced. The introduction of the testimony was offered by
> the state as "truth" to improperly establish motive, was not probative
> as prejudicial and was improper. Evidence of "bad acts" by the

---

[11] State Rec., Vol. IV of V, transcript of September 29, 2009.

defendant.   The testimony violated Mr. Wilson's right to confrontation and cross examination and was not harmless considering the circumstantial nature of the state's case with regard to specific intent and identification.[12]

On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim,

holding:

> [D]efendant argues that the trial court erred in permitting hearsay testimony of the victim's friend, Jacklyn Bell, that, defendant asserts, was offered as evidence of bad acts.
>
> The trial court granted a pretrial motion *in limine* filed by the State, permitting the State to introduce the testimony by Jacklyn Bell as to what the victim told her about a man with a name similar to defendant's.
>
> Defendant sought supervisory review from this court as to that ruling on June 10, 2009.   This court denied the writ, stating, "[t]he relator has an adequate remedy on appeal, if convicted."   State v. Wilson, unpub., 2009-0783 (La.App. 4 Cir. 6/26/09).   Defendant essentially made the same arguments in the writ application that he now makes in the instant assignment of error.
>
> Bell testified at trial that the victim was her best friend, and that the victim had talked about defendant several times before, including the last day Bell had any contact with the victim, a telephone conversation two weeks before she was murdered.   The victim told Bell about an older black male named "Trav or something, Trevon or something like that, and Williams or Wilson," who had been bothering her about wanting to prostitute her out for drugs or money.   Bell had asked the victim if the individual was "boneable," and the victim said, "No, he's ugly as f——.   You don't even know."   The victim told Bell she met the man at "Bewitched Gentlemen's Club," where she worked as dancer.
>
> La. C.E. art. 803(3) states, in pertinent part, that the following is not excluded from evidence by the hearsay rule:
>
> > **(3) Then existing mental, emotional, or physical condition**.   A statement of the declarant's then existing state of mind, emotion, sensation, or

---

[12]  Rec. Doc. 1, p. 9.

physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), offered to prove the declarant's then existing condition or his future action.

In State v. Brown, 562 So.2d 868 (La. 1990), the State was allowed to introduce a statement made by the victim approximately a day and a half before her death which the State contended was "probative of the decedent's state of mind toward defendant." Id. at 869. Her statement "revealed decedent's perception of defendant being sexually interested in her and her present state of mind or intent not to have sexual relations with him." Brown, 562 So.2d at 869. The decedent's body was later found with her jeans unfastened and pulled down; the defendant was the last person seen with her alive. The appellate court reversed the defendant's conviction on the grounds that the victim's statement was improperly admitted because the victim's state of mind was not at issue as no evidence demonstrated that she had communicated her state of mind to the defendant. The Louisiana Supreme Court reversed, holding that the victim's extrajudicial statement was "relevant to show that she was not sexually interested in Brown and would have subsequently rejected his sexual advances." Brown, 562 So.2d 880.

The court in Brown further explained that the victim's "state of mind became a fact at issue from evidence elicited on cross-examination when it was coupled with other facts in evidence. And the evidence's probativeness outweighed any prejudice caused by its admittance." Id. The court noted, however, that the defendant should have requested a limiting instruction to the jury to consider the testimony only as evidence of the victim's state of mind, and not as proof "for the truthfulness of the assertion he 'wanted her.'" Id. The court then concluded that the absence of this instruction was harmless and reinstated the defendant's conviction.

The court in Brown extensively addressed the issue as follows:

The official comments to Article 803 indicate section 3 thereof clarifies prior Louisiana law and generally follows F.R.E. 803(3). Louisiana's section 3 differs from its parent rule by adding the phrase, "offered to prove the declarant's then existing condition or his future action," in order to accord with prior state jurisprudence. Comment 803(3)(b); See

– 18 –

State v. Weedon, *supra* [an extrajudicial declaration by one person is inadmissible to show the subsequent conduct of another]. The comments also clarify the exception covers declarations only when the declarant's state of mind is a fact at issue, although it need not be an ultimate issue. Comment 803(3)(c); See State v. Doze, 384 So.2d 351 (La. 1980) [declarant's state of mind was not at issue; however, the defendant's state of mind was at issue but the evidence could not be used to prove his motive for the killing].

A state of mind declaration is relevant if it has a tendency to make the existence of any consequential fact more or less probative than it would otherwise be without the evidence. See former LSA-R.S. 15:441-442; LSA-C.O.E. Art. 401. Nevertheless, relevant declarations may be legally inadmissible if its [sic] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misapplication by the jury. See LSA-C.O.E. Art. 403. When there is no evidence showing the decedent communicated his or her intention to the defendant, hearsay evidence of decedent's declaration is not relevant and may not be introduced to prove defendant's motive. However, when the declaration of intent or state of mind is used to show the decedent's own subsequent acts, its relevance is not dependent upon communication to the defendant. State v. Martin, *supra*. Cf. State v. Doze, *supra*; State v. Weedon, *supra*.

Extrajudicial statements of declarant's subjective fear or revulsion have considerable probative value in circumstantially explaining the declarant's subsequent conduct. See Lilly, An Introduction to the Law of Evidence, 2d ed., section 7.12-7.13 [Even when the declarant's state of mind is not the ultimate proposition to be proven, the declaration may be used as circumstantial evidence of declarant's behavior by providing an intermediate basis for further inferences about declarant's conduct. Where extrajudicial declarations are offered to show the declarant's state of mind or intent to undertake a

course of action, when the communication indicates the act is dependent upon an event or upon acts of another, the contingency operates only to reduce the probative force (weight) of the evidence, but not its admissibility. The declaration remains admissible under the state of mind exception (it is hearsay if the use of the evidence necessitates reliance upon the truth of the declarant's assertion) even if it carries with it the associated inference that the other possible participant acted or undertook a course of conduct.] The declarations are non-hearsay if offered only to circumstantially prove decedent's state of mind prior to the homicide. State v. Tonubbee, 420 So.2d 126 (La. 1982), cert. den., Tonubbee v. Louisiana, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).

Declarations of fear and revulsion, however, characteristically contain both admissible and inadmissible hearsay components through referencing past acts, predictions of defendant's future conduct or statements of decedent's beliefs. Cf. People v. Madson, 638 P.2d 18 (Colo. 1981), en banc. Consequently, the admissibility of such statements, "must be determined by a careful balancing of their probative value against their prejudicial effect." United States v. Brown, 160 U.S.App.D.C. 190, 490 F.2d 758, 766 (1974); Bennett v. U.S., 375 A.2d 499 (D.C. Ct. of App. 1977). The relevancy of the admissible portion of the declaration must be weighed then against the inadmissible portion. Cf. People v. Madson, supra. And the trial court's task is to balance the need for the evidence, when used for the proper purpose, against the danger of the evidence being used by the jury for an improper purpose. State v. Wille, 559 So.2d 1321 (La. 1990).

Declarations of fear or revulsion either take the form of direct evidence of the mental state ("I am afraid of defendant") and, as such, are hearsay offered to prove their contents. Or, they take the form of evidence circumstantially probative of the declarant's state of mind ("Defendant threatened to kill me."). Technically, the latter assertions are not hearsay because they are not offered to prove the truth of what

was said, but to circumstantially show the declarant's state of mind toward defendant of and, hence, are not hearsay. <u>Bennett v. U.S.</u>, *supra*. Invariably, these declarations involve extraneous factual elements. <u>Id</u>.

Declarations of fear, however, should be distinguished from declarations of revulsion, because declarations of fear consistently reflect upon defendant's past or future aggressive actions, defendant's culpability, or the dispositive issue of the case. <u>Cf</u>. <u>Bennett v. U.S.</u>, *supra*; <u>United States v. Brown</u>, *supra*.....

In contrast, declarations of revulsion ("I don't like defendant." or "I'm not interested in having a casual affair with anyone.") may circumstantially evince declarant's expected reaction to defendant or show the probable nature of their future conduct, without necessarily averting to defendant's aggressive or culpable acts. <u>But see</u> <u>State v. Raymond</u>, *supra* [declaration of revulsion averted to defendant's prior homosexual conduct]. The risk of unfair prejudice to defendant by confusing the jury with inflammatory or dispositive allegations, therefore, decreases. Consequently, in homicide cases, extrajudicial declarations of revulsion have been found relevant, admissible evidence as immediately antecedent circumstances explanatory of the killing and tending to connect the accused with it. <u>State v. Raymond</u>, *supra*, 245 So.2d at 432 (Tate, J., concurring); <u>State v. Weedon</u>, *supra*; <u>State v. Tonubbee</u>, *supra*.

<u>Brown</u>, 562 So.2d at 878-879.

In the instant case, defendant stated in his first statement that the victim went with him to his trailer intending to have sex with the victim, although he had told her on Bourbon Street before they left for his trailer that he had no money. Defendant maintained that his first statement was the truth – not his second statement, in which he said that he had sex with the victim for money but afterward refused to pay her because he did not have the money. Jacklyn Bell testified that when she asked the victim if the individual who was bothering her was "boneable," the victim replied in the negative, saying that he was "ugly as f——." This statement related by Bell was evidence of sexual revulsion on the part of the victim toward defendant,

suggesting that she would not have had consensual sexual relations with him, as he indicated in his first statement had been the case.

This extrajudicial declaration of sexual revulsion toward defendant was relevant and admissible under La. C.E. art. 803(3). Although the trial court stated in its reasons for finding defendant guilty as charged that it did not consider this testimony by Jacklyn Bell in reaching its verdict, the court nevertheless had granted the State's motion *in limine* admitting the testimony, and the evidence was admitted at trial. It cannot be said that the probative value of this relevant evidence was substantially outweighed by the danger of unfair prejudice as contemplated by La. C.E. art. 403.

Defendant implies that the testimony of Jacklyn Bell was inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in which the U.S. Supreme Court held that the admission of "testimonial" hearsay evidence violated a defendant's Sixth Amendment right to confrontation. However, defendant mistakenly implies that the evidence at issue was "testimonial" hearsay. It was not. While the U.S. Supreme Court noted in Crawford that it was "leav[ing] for another day any effort to spell out a comprehensive definition of 'testimonial', ... [w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68, 124 S.Ct. at 1374. The Court had earlier in its opinion referred to various formulations of "testimonial" statements, such as *ex parte* in-court testimony or its functional equivalent, citing as examples affidavits, custodial examinations, prior testimony that that the defendant was unable to cross-examine, "or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Crawford, 541 U.S. at 51, 124 S.Ct at 1364. The Court noted that the Sixth Amendment's Confrontation Clause "applied to 'witnesses' against the accused – in other words, those who 'bear testimony.'" Id. The Court stated that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. The Court stated that where "nontestimonial" hearsay was concerned, it was "wholly consistent" with the Framers' design to afford the States flexibility in their development of hearsay law...." 541 U.S. at 68, 124 S.Ct. at 1374.

Crawford involved a taped statement given by the defendant's wife to police during an interrogation after the defendant stabbed a man to death who had allegedly insulted the defendant's wife. The

wife did not testify at trial because of Washington State's marital privilege.  The audio tape of her statement was played for the jury over the objection of the defendant.  It was ruled admissible by the trial court as an exception to the hearsay rule under Washington State rules of evidence, being deemed a statement against the wife's penal interest.

In the instant case, the victim's statement to Jacklyn Bell was made by the victim prior to any crime being committed.  It was not made during a police interrogation, preliminary hearing, before a grand jury or at a former trial.  The statement by the victim was a "casual remark to an acquaintance."  See Crawford, 541 U.S. at 51, 124 S.Ct at 1364.  The statement was "nontestimonial" hearsay, and therefore Crawford does not apply.

The trial court in the instant case properly admitted the hearsay testimony under La. C.E. art. 803(3).

There is no merit to this assignment of error.[13]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[14]

To the extent that petitioner is asking this Court to hold that the state courts misapplied the state's evidentiary rules, the Court cannot oblige.  Where the state courts have ruled that testimony was admissible under state evidentiary law, "a federal habeas court may not conclude otherwise."  Charles v. Thaler, 629 F.3d 494, 500 (5th Cir. 2011).  The United States Fifth Circuit Court of Appeals has explained:  "Under § 2254, federal habeas courts sit to review state court misapplications of federal law.  A federal court lacks authority to rule that a state court incorrectly interpreted its own law.  When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."  Id. at 500-01.

---

[13]  Wilson, 2011 WL 9159662, at *10-14; State Rec., Vol. II of V.

[14]  State v. Wilson, 68 So.3d 525 (La. 2011) (No. 2011-KO-0382); State Rec., Vol. IV of V.

To the extent that petitioner is claiming that the testimony at issue violated his rights under the federal Confrontation Clause, that claim has no merit.  As the United States Fifth Circuit Court of Appeals has explained:

> The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[FN21]  In Crawford v. Washington,[FN22] the Supreme Court held that this right is violated when the prosecution introduces "*testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."
>
> [FN21] U.S. Const. amend. VI.
>
> [FN22] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Brown v. Epps, 686 F.3d 281, 286 (5th Cir. 2012) (emphasis added).  Accordingly, "[o]nly testimonial hearsay implicates the Confrontation Clause."  Id. at 286 n.20 (emphasis added).  "'[A] statement that is not testimonial *cannot* violate the Confrontation Clause.'"  Id. at 286 (emphasis added) (quoting United States v. Vasquez, 234 Fed. App'x 310, 313 (5th Cir. 2007)).

The statements at issue in this claim were clearly nontestimonial.  The statements were made by the victim in a private conversation with Bell before the instant crime was even committed.  Purely private conversations between two citizens are nontestimonial where, as here, the circumstances would not lead an objective person reasonably to believe that the statement would be available for use at a later trial.  See United States v. Pelletier, 666 F.3d 1, 9-10 (1st Cir. 2011), cert. denied, 132 S.Ct. 2683 (2012); United States v. Brown, 441 F.3d 1330, 1360 (11th Cir. 2006); McKinney v. Bruce, 125 Fed. Appx. 947, 950 (10th Cir. 2005); Evans v. Luebbers, 371 F.3d 438,

444-45 (8th Cir. 2004); Guilbeau v. Cain, Civ. Action No. 05-1399, 2007 WL 2478888, at *7-10

(W.D. La. July 31, 2007) (Hill, M.J.) (adopted by Doherty, J., on August 29, 2007).

       For these reasons, petitioner cannot show that the state court's decision rejecting his

federal Confrontation Clause claim was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States.

Accordingly, under the deferential standards of review mandated by the AEDPA, the claim should

be denied.

### C.  Insufficient Evidence

       Lastly, petitioner claims that there was insufficient evidence to support his

conviction.  The Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> In this assignment of error, defendant claims that the evidence
> is constitutionally insufficient to support his conviction. ...
> This court set out the well-settled standard for reviewing
> convictions for sufficiency of the evidence in State v. Ragas, 98-0011
> (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
>
>> In evaluating whether evidence is
>> constitutionally sufficient to support a conviction, an
>> appellate court must determine whether, viewing the
>> evidence in the light most favorable to the
>> prosecution, any rational trier of fact could have
>> found the defendant guilty beyond a reasonable doubt.
>> Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61
>> L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757
>> (La.App. 4 Cir.1991).  However, the reviewing court
>> may not disregard this duty simply because the record
>> contains evidence that tends to support each fact
>> necessary to constitute the crime.  State v. Mussall,
>> 523 So.2d 1305 (La. 1988).  The reviewing court
>> must consider the record as a whole since that is what
>> a rational trier of fact would do.  If rational triers of
>> fact could disagree as to the interpretation of the

evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; *supra*.  "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.

In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La. 1982).  The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, *supra*, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.  State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard.  State v. Jacobs, 504 So.2d 817 (La. 1987).

98-0011 at pp. 13-14, 744 So.2d at 106–107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.

Defendant was charged and convicted of second degree murder, a violation of La. R.S. 14:30.1, which defines the crime, in pertinent part, as the killing of a human being:

(1) When the offender has a specific intent to kill or inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape,....

Specific criminal intent is a state of mind, and it need not be proven as a fact, but may be inferred from the circumstances and the

actions of the accused.  State v. Scott, 2009-0138, p. 8 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, 289, *writ denied* 2009-2773 (La. 6/18/10), 38 So.3d 320; State v. Hart, 2004-0121, p. 8 (La.App. 4 Cir. 8/18/04), 881 So.2d 1237, 1242.  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.  State v. Bridgewater, 2000-1529, p. 8 (La. 1/15/2002), 823 So.2d 877, 910.

Defendant admitted to having sexual relations with the victim shortly before her death.  He indicated the sex was consensual.  However, there was evidence that the victim would not have had consensual sex with the victim [sic].  There was evidence that the victim was repulsed by defendant.  That the trial court did not consider that evidence is of no matter.  The evidence was introduced and should be considered in determining whether the evidence was sufficient to support defendant's conviction.  Defendant's statement to police and his testimony concerning the "pimp" or "Sugar Daddy" bordered on the bizarre.  Besides defendant's own self-serving testimony, there was no evidence that this individual existed.  The known evidence is that defendant met the victim in the French Quarter; that she went to defendant's trailer where they had sexual relations; that she had expressed revulsion at the notion of having sexual relations with defendant prior to that time; that she was found hours later naked and dead in a service alley in the same block as defendant's trailer; that the victim sustained four bullet wounds, three of which were from bullets fired from between near contact range to eighteen inches away; that within hours after the victim was killed defendant traveled with his cousin to the Baton Rouge home of his sister; and that after being tracked by police to his sister's home in Baton Rouge he gave two conflicting statements to officers investigating the homicide.

Flight is a circumstance from which guilt can be inferred.  State v. Smith, 98-2645, p. 5 (La.App. 4 Cir. 1/26/00), 752 So.2d 314, 317-318; State v. Recasner, 98-2518, p. 3 (La.App. 4 Cir. 12/22/99), 750 So.2d 336, 338; see also State v. Allen, 2003-2156, p. 9 (La.App. 4 Cir. 5/19/04), 876 So.2d 122, 128 (defendant's action in hiding in an attic when police searched for him in residence to arrest him was a circumstance from which the jury could infer his guilt of second degree murder).

The location, type, placement and number of wounds are circumstances from which specific intent to inflict great bodily harm can be inferred.  See State v. Legrand, 2002-1462, p. 17 (La. 12/3/03), 864 So.2d 89, 101 ("the other evidence of the defendant's

specific intent was overwhelming. The location, placement, type, and number of wounds ... clearly establish that the defendant had, at least, the specific intent to inflict great bodily harm upon the victim.").

In the instant case, the victim was shot four times. Defendant argues in his brief on appeal that the State failed to establish that defendant, "who may have accidentally shot [the victim] once during the course of a struggle, had inflicted any other wounds." This argument by defendant apparently takes into account his second statement wherein he indicated that he might have struggled with the victim and her handgun accidentally went off. However, the victim sustained four gunshot wounds. Viewing all of the evidence in a light most favorable to the prosecution, it would be irrational to believe that defendant accidentally shot the victim once, or was responsible for her "accidentally" being shot once, but that someone else shot her three additional times and disposed of the body. It would be equally irrational to believe that defendant accidentally shot the victim four times or that she was otherwise accidentally shot four times. Defendant said the victim had a handgun – not a machine gun.

Defendant is correct that no items of the victim's clothing or a gun were ever found. Nevertheless, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense of second degree murder present beyond a reasonable doubt.

There is no merit to this assignment of error.[15]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[16]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1);

---

[15]  Wilson, 2011 WL 9159662, at *6-8; State Rec., Vol. II of V.

[16]  State v. Wilson, 68 So.3d 525 (La. 2011) (No. 2011-KO-0382); State Rec., Vol. IV of V.

Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing.

As correctly noted by the state court, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 132 S.Ct.2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.")  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012).  Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that  every reasonable hypothesis of innocence be excluded does *not* apply in federal

*habeas corpus* proceedings; in these proceedings, *only* the <u>Jackson</u> standard need be satisfied, even if state law would impose a more demanding standard of proof.  <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 Fed. App'x 405 (5th Cir. 2011), <u>cert. denied</u>, 132 S.Ct. 1713 (2012); <u>Williams v. Cain</u>, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), <u>aff'd</u>, 408 Fed. App'x 817 (5th Cir. 2011); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); <u>Wade v. Cain</u>, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), <u>aff'd</u>, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); <u>see also</u> <u>Coleman</u>, 132 S.Ct. at 2064 ("Under <u>Jackson</u>, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

   For the reasons noted by the state court, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under these doubly-deferential standards of review which must be applied by this federal *habeas* court, the claim should be denied.

### **<u>RECOMMENDATION</u>**

   Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Trave Wilson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[17]

New Orleans, Louisiana, this first day of April, 2013.

_____
**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[17] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.